Brian KAUFFMAN, Plaintiff,

v.

MAXIM HEALTHCARE SERVICES, INC., Defendant.

No. 04–CV–2869 (SJF)(AKT).

United States District Court, E.D. New York.

Sept. 5, 2007.

Jeffrey M. Bernbach, Jason Bernbach, Bernbach Law Firm PLLC, White Plains, NY, for Plaintiff.

Eric A. Savage, Littler Mendelson, P.C., Newark, NJ, for Defendant.

## OPINION & ORDER

FEUERSTEIN, District Judge.

## I. Introduction

This action by plaintiff Brian Kauffman ("Plaintiff") against defendant Maxim Healthcare Services, Inc. ("Defendant"), alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), 42 U.S.C. § 1981(a), and New York State Human Rights Law, N.Y. Exec. L. § 290 *et seq.* ("NYSHRL") was

bifurcated for trial.[1] The liability phase, from May 21, 2007 through May 30, 2007, resulted in a jury verdict finding Defendant liable for retaliation and awarding Plaintiff one million five hundred thousand dollars ($1,500,000.00) in punitive damages. The damages phase, from July 17, 2007 through July 19, 2007, resulted in a verdict awarding Plaintiff one hundred thirty seven thousand nine hundred thirty five dollars ($137,935.00) in compensatory damages.

Defendant now moves pursuant to Fed. R. Civ. P 59(a) for a new trial or, alternatively, for *remittitur* as to the amount of punitive damages. For the reasons set forth below, Defendant's motion for a new trial is denied and Defendant's motion for *remittitur* of the punitive damages award is granted.

## II. Background

Plaintiff filed the instant action on July 9, 2004. The case was assigned to Judge Thomas C. Platt. Defendant moved for summary judgment on June 26, 2006. On July 13, 2006, Judge Platt denied Defendant's motion in its entirety. *See Kauffman v. Maxim Healthcare Service, Inc.,* No. 04–CV–2869, 2006 WL 1983196 (E.D.N.Y. July 13, 2006). The case was scheduled for trial before Judge Platt on April 30, 2007. On the morning of trial, Judge Platt informed the parties that this case was being transferred to this Court as it was related to the earlier breach of contract case of *Maxim Healthcare Services, Inc. v. Kauffman,* No. 04–CV–1140, that was assigned to this Court.[2] On May 2, 2007, the case was reassigned from Judge Platt to this Court.

A jury trial on liability commenced on May 21, 2007. During the course of the trial, the Court dismissed Plaintiff's claim of "association discrimination," ruling that only Plaintiff's retaliation claim and the issue of punitive damages would be submitted to the jury. Defendant objected to the submission of punitive damages to the jury. On May 30, 2007, the jury found Defendant liable for retaliation. Specifically, the jury found that Plaintiff: 1) had a good faith belief that Defendant had a policy of discrimination against women and minorities; 2) engaged in protected activity; 3) made known to Defendant his opposition to the discriminatory policy prior to his termination; and 4) his opposition to Defendant's discriminatory policy was a motivating factor in his termination. The jury also awarded Plaintiff one million five hundred thousand dollars ($1,500,000.00) in punitive damages. *See* Court Ex. 4.

A jury trial on compensatory damages commenced on July 17, 2007. On July 19, 2007, the jury found that Plaintiff proved by a preponderance of the evidence that he was entitled to damages for backpay and emotional distress and awarded Plaintiff seventy four thousand one hundred eighty five dollars ($74,185.00) in back pay damages and sixty three thousand seven hundred fifty dollars ($63,750.00) in emotional distress damages, for a total of one hundred thirty seven thousand nine hundred thirty five dollars ($137,935.00) in compensatory damages. *See* Court Ex. 3. On July 30, 2007, Defendant filed the instant post-trial motion.

---

**1.** The facts underlying this case are set forth in the decision on Defendant's motion for summary judgment. *See Kauffman v. Maxim Healthcare Service, Inc.,* No. 04–CV–2869, 2006 WL 1983196 (E.D.N.Y. July 13, 2006) (Platt, J.). Therefore, the Court will presume familiarity with the relevant factual background in this case.

**2.** Case 04–CV–1140 had been settled and dismissed by this Court on February 25, 2005.

### III. Analysis

#### A. Motion for a New Trial

■ Rule 59(a) of the Federal Rules of Civil Procedure provides that a court may grant a new trial in a jury case for any of the reasons "for which new trials have heretofore been granted in the courts of the United States." Fed.R.Civ.P. 59(a). "A new trial may be granted, therefore, when the jury's verdict is against the weight of the evidence." *DLC Mgmt. Corp. v. Town of Hyde Park,* 163 F.3d 124, 133 (2d Cir.1998) (citations omitted). "Unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict. Moreover, a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." *Id.* at 134 (citing *Song v. Ives Labs.,* 957 F.2d 1041, 1047 (2d Cir. 1992)). However, "[a] motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Munafo v. Metro. Transp. Auth.,* 381 F.3d 99, 105 (2d Cir.2004) (quoting *Atkins v. New York City,* 143 F.3d 100, 102 (2d Cir.1998) (internal citation omitted)).

■ "One example of a miscarriage of justice would be an improper jury charge that 'seriously affected' the jury's understanding of an issue 'to the prejudice of the complaining party.'" *U.S. ex rel. Maris Equipment Co., Inc. v. Morganti, Inc.,* 163 F.Supp.2d 174, 193 (E.D.N.Y.2001) (quoting *Havoco of America, Ltd. v. Sumitomo Corp. of America,* 971 F.2d 1332, 1343 (7th Cir.1992)), *aff'd,* 67 Fed.Appx. 68 (2d Cir. 2003).

Citing the recent Supreme Court case of *Philip Morris v. Williams,* — U.S. —, —, 127 S.Ct. 1057, 1063, 166 L.Ed.2d 940 (2007), Defendant contends that submission of Plaintiff's punitive damages claim to the jury was erroneous because the claim was, in part, based upon discrimination directed at persons who were not party to the litigation, specifically Kristen Dassylva ("Dassylva"), Julia Mastantuono ("Mastantuono"), and Andre Wright ("Wright").[3] In *Philip Morris,* the Supreme Court held that "the Constitution's Due Process Clause forbids a State to use a punitive damages award to punish a defendant for injury that it inflicts upon nonparties or those whom they directly represent, i.e., injury that it inflicts upon those who are, essentially, strangers to the litigation." *Id.* at 1063. However, the court reaffirmed that plaintiffs may show harm to non-parties to demonstrate "a different part of the punitive damages constitutional equation, namely, reprehensibility." *Id.* at 1064. *See id.* ("[H]arm to others shows more reprehensible conduct."). Therefore, while a jury may consider harm to others as evidence of reprehensibility, it may not punish a defendant for harm done to those nonparties. *Id.*

■ During the course of the trial, Plaintiff proffered proof of discriminatory

---

**3.** "A principle that strikes very deep is that a new trial will not be granted on grounds not called to the court's attention during the trial unless the error was so fundamental that gross injustice would result." 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure: Civil 2d § 2805 at 57–58. However, contrary to Plaintiff's contention, Defendant raised this issue at the close of Plaintiff's case, when Defendant "move[d] to dismiss the claim, dismiss the complaint or the alternative to dismiss that portion of the complaint which seeks emotional or punitive damages." Tr. 95 (May 29, 2007). Defendant also stated: "We move for a complete dismissal of the complaint or in the alternative to dismiss the claim for punitive and emotional distress." Tr. 97–98 (May 29, 2007).

statements by Defendant's executives about Dassylva, Mastantuono, and Wright based upon their race and/or gender.[4] In presenting this information to the jury, Plaintiff was seeking to prove that: 1) he had a good faith belief that Defendant had a policy of discriminating against women and minorities; and 2) Defendant's conduct was reprehensible. Plaintiff did not seek an award of punitive damages for any individual injured by Defendant's discriminatory practices and its effects other than himself. Indeed, Defendant does not point to any remarks made by Plaintiff's counsel during the trial to the contrary. *Cf. Cerqueira v. Am. Airlines, Inc.,* 484 F.Supp.2d 232, 239–40 (D.Mass.2007) (defendant specifically challenged a statement in plaintiff's summation as "raising the possibility of juror confusion on the issue of punishing [defendant] for harm done to persons other than [plaintiff]").

■ Further, although Defendant now argues that the Court's jury instructions were not clear in light of the *Philip Morris* case, Defendant's failed to request a jury instruction based on the holding of the *Philip Morris* case[5] or object to the Court's instruction on that basis. This claim is therefore unpreserved. *See Philip Morris,* 127 S.Ct. at 1065. ("In particular, we believe that where the risk that misunderstanding is a significant one—because, for instance, of the sort of evidence that was introduced at trial or the kinds of argument that plaintiff make to the jury— a court, *upon request,* must protect against that risk.") (emphasis added).[6] "Under Rule 51 of the Federal Rules of Civil Pro-

cedure, a party in a civil action must make specific objections to jury instructions before the jury retires to deliberate." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,* 314 F.3d 48, 61 (2d Cir.2002). *See Jarvis v. Ford Motor Co.,* 283 F.3d 33, 57 (2d Cir.2002) (" '[F]ailure to object to a jury instruction or the form of an interrogatory prior to the jury retiring results in a waiver of that objection.... Surely litigants do not get another opportunity to assign as error an allegedly incorrect charge simply because the jury's verdict comports with the trial courts instructions.' " (quoting *Lavoie v. Pac. Press & Shear Co.,* 975 F.2d 48, 55 (2d Cir.1992))). *See also* 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure: Civil 2d § 2805 at 57–58 ("This principle [preservation] has particular application to claims of error in instructions that were not objected to since it is stated in so many words in Rule 51."). At the conclusion of the Court's charge to the jury, when asked by the Court if there were any exceptions, Defendant failed to except to any aspect of the charge. In fact, Defendant stated: "We have no exception to the charge. We think that the Court accurately summarized the law and the charge should remain as is." Tr. 139 (May 30, 3007).

Finally, insofar as Defendant appears to argue that a new trial is necessary because the jury's award of punitive damages was against the weight of the evidence, the motion is denied. The jury's determination that Plaintiff is entitled to punitive damages was not against the weight of the

---

**4.** For example, Defendant's Regional Account Manager Lee Shipman ("Shipman") admitted to referring to Wright, who is African–American, as "too ghetto" to be hired by Defendant. Tr. 107 (May 23, 2007).

**5.** In fact, Defendant failed to submit a suggested charge on punitive damages at all. *See*

Def.'s Proposed Jury Instructions, dated March 12, 2007.

**6.** The appeal in *Philip Morris* was based upon the trial court's rejection of such a charge proposed by the defendant in that case. *Philip Morris,* 127 S.Ct. at 1061.

evidence nor was it "seriously erroneous" or a "miscarriage of justice." Therefore, Defendant's motion for a new trial on this ground is denied.

B. Remittitur

■■ Punitive damages must be "reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition." *Pacific Mutual Life Insurance Co. v. Haslip*, 499 U.S. 1, 21, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). A punitive damages award will not be disturbed unless the amount is "so high as to shock the judicial conscience and constitute a denial of justice." *O'Neill v. Krzeminski*, 839 F.2d 9, 13 (2d Cir.1988) (quoting *Zarcone v. Perry*, 572 F.2d 52, 56–57 (2d Cir.1978)). In reviewing a punitive damages award, a court must construe the evidence in the light most favorable to the nonmoving party. *Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 683 (2d Cir.1993) (citation omitted). The Supreme Court has identified three (3) guideposts for determining whether a punitive damages award is excessive: 1) the degree of reprehensibility of the defendant's misconduct; 2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and 3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed for comparable misconduct. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574–575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

■■ Defendant limits its argument to the disparity between the actual or potential harm suffered by Plaintiff and the punitive damages award. Defendant argues that, in light of the award of one hundred thirty seven thousand nine hundred thirty five dollars ($137,935.00) in

compensatory damages, the jury's award of one million five hundred thousand dollars ($1,500,000.00) in punitive damages was so excessive as to be unconstitutional. Thus, according to Defendant, the Court should order *remittitur* of the punitive damages award pursuant to Fed.R.Civ.P. 59. The Court agrees.

1. Reprehensibility of Defendant's Conduct

■■ The Supreme Court has held that the degree of reprehensibility of the conduct is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." *Gore*, 517 U.S. at 575, 116 S.Ct. 1589. In determining the degree of reprehensibility of a given course of action, the Court considers "whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (citing *Gore*, 517 U.S. at 576–77, 116 S.Ct. 1589).

There is evidence in the record from which the jury could have concluded that the degree of reprehensibility of Defendant's conduct was substantial. Plaintiff endured sexist and racist remarks throughout his tenure with Defendant. He was pressured by Defendant to engage in illegal acts to perpetuate discriminatory employment practices designed to maintain Defendant as a "white-male-driven" company.[7] He was berated, intimidated,

---

7. For example, Plaintiff was berated by Shipman and Regional Account Manager Jim Mil-

ler for having hired the soon-to-be-"knocked-up" Mastantuono, and urged to discharge her

and threatened by Defendant's executives when he refused to accede to their unlawful demands upon him and punished for such refusal by being transferred to the distant New Haven office, and ultimately, by being terminated. He was also summarily ejected from his office while being cursed at by Shipman for his refusal to discriminate.[8]

Nevertheless, not all of the factors in the reprehensibility analysis favor Plaintiff. Although Defendant's conduct was certainly offensive, it cannot be characterized as either violent or presenting the threat of violence. *See Mahoney v. Canada Dry Bottling Co. of New York/Coors Distributing Co. of New York,* No. 94–CV–2924, 1998 WL 231082, at *8 (E.D.N.Y. May 7, 1998). Further, the physical health and safety of others were not imperiled by Defendant's conduct.

However, in summarily terminating Plaintiff, Defendant deprived Plaintiff of his livelihood and inflicted economic harm upon a financially vulnerable target. *See Iannone v. Frederic R. Harris, Inc.,* 941 F.Supp. 403, 415 (S.D.N.Y.1996) ("On the other hand, the retaliatory action taken by Mr. Posch was severe. The jury found that in retribution for voicing her concern ... Ms. Iannone was deprived of her livelihood.").

Defendant's conduct also involved repeated actions of misconduct with respect to other employees. *See Fernandez v. North Shore Orthopedic Surgery & Sports Medicine, P.C.,* 79 F.Supp.2d 197, 207 n.

15 (E.D.N.Y.2000) (collecting cases and remarking, "[t]he phrase 'repeated instances of misconduct,' as used by the Second Circuit in *Lee v. Edwards* (citing *BMW v. Gore* ) appears to refer to evidence of repeated misconduct with respect to other employees rather than repeated misconduct against the plaintiff." (case citations omitted)). Defendant's President Brian Wynne admitted that over the course of Defendant's nearly twenty (20) year existence, there have been virtually no women and minorities in its upper management. Tr. 32–33 (May 24, 2007). Since upper management was primarily the product of internal advancement, this resulted from a long-term policy of discrimination against entry-level candidates.[9] *See Ortiz–Del Valle v. National Basketball Ass'n,* 42 F.Supp.2d 334, 345 (S.D.N.Y.1999) (considering a finding of a continuing violation of misconduct, defined as proof of ongoing discriminatory policies or practices towards persons other than the plaintiff, in determining the reprehensibility of the defendant's conduct).

Finally, Defendant's actions were clearly intentional and intended to punish Plaintiff because he refused to follow the company's discriminatory hiring practices.

2. Ratio Between Punitive and Compensatory Damages

██ Punitive damages must bear a "reasonable relationship" to the compensatory damages awarded.[10] *Gore,* 517 U.S.

---

on the basis of her gender. Tr. 1–2, 18–19 (May 21, 2007).

**8.** At the time of his discharge Shipman told Plaintiff that he "could not make things the way Jim Miller and him wanted them to be ... [and make] the hiring policy fit within the company's culture." Tr. 28–29 (May 21, 2007).

**9.** Former account manager Brian Kelly testified that, like Plaintiff, he saw a worthy African–American recruiter candidate, Keisha Brown, rejected by Shipman for blatantly racist reasons. Tr. 12–14 (May 23, 2007).

**10.** Compensatory damages include back pay awards. *See Iannone,* 941 F.Supp. at 415 ("[U]nlike the assessment made in a traditional personal injury action, the magnitude of

at 580, 116 S.Ct. 1589. However, the Supreme Court has "been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award." *State Farm*, 538 U.S. at 410, 123 S.Ct. 1513. *Accord Gore*, 517 U.S. at 582, 116 S.Ct. 1589 ("[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award.") (emphasis omitted).

Nevertheless, the Supreme Court has held that "few awards exceeding a single-digit ratio ... will satisfy due process." *State Farm*, 538 U.S. at 425, 123 S.Ct. 1513. In *Pacific Mut. Life Ins. v. Haslip*, the Supreme Court concluded that a four (4) to one (1) ratio was "close to the line" of excessiveness, but did not "cross the line into the area of constitutional impropriety." 499 U.S. 1, 23–24, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). Two (2) years later, in *TXO Production Corp. v. Alliance Resources Corp.*, the court suggested that the upper limit was perhaps closer to ten (10) to one (1). 509 U.S. 443, 462, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). The Second Circuit has added that ratios exceeding "single-digit multipliers" may be appropriate "where the plaintiff receives an insignificant or nominal compensatory award."[11] *Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 126 (2d Cir.2004). *See Lee v. Edwards*, 101 F.3d 805, 811 (2d Cir.1996) ("[I]n a 1983 case in which the compensatory damages are nominal, a much higher ratio can be contemplated ..."). Further, since punitive damages are designed to deter similar conduct, the financial circumstances of the defendant

may be taken into account. *TXO Production Corp.*, 509 U.S. at 464, 113 S.Ct. 2711.

The ratio of punitive to compensatory damages in this case—nearly eleven (11) to one (1)—exceeds what the Supreme Court has suggested is the constitutionally permissible limit. *See e.g., Iannone*, 941 F.Supp. 403 (ratio of 10 to 1 remitted to approximately 2 to 1); *Mahoney v. Canada Dry Bottling Co. of New York*, No. 94–CV–2924, 1998 WL 231082, at *27 (E.D.N.Y. May 7, 1998) (ratio of 19 to 1 remitted to 3 to 1); *Greenbaum v. Handelsbanken*, 67 F.Supp.2d 228 (S.D.N.Y. 1999) (upholding ratio of 3.75 to 1); *Ortiz-Del Valle*, 42 F.Supp.2d at 345 (ratio of 58.3 to 1 remitted to approximately 2.5 to 1); *Hill v. Airborne Freight Corp.*, 212 F.Supp.2d 59, 77 (E.D.N.Y.2002) (in a multi-defendant case crafting an award that resulted in a cumulative ratio of approximately 5 to 1), *aff'd*, 93 Fed.Appx. 260 (2d Cir.2004); *Parrish v. Sollecito*, 280 F.Supp.2d 145, 164 (S.D.N.Y.2003) (ratio of 33 to 1 remitted to approximately 3.3 to 1).

■ In considering the ratio of punitive to compensatory damages, courts may also consider potential harm, in addition to harm that has already occurred. *TXO Production Corp.*, 509 U.S. at 462, 113 S.Ct. 2711; *Gore*, 517 U.S. at 581–82, 116 S.Ct. 1589. Plaintiff argues that the potential harm to him as a result of Defendant's actions was far greater than the actual harm he suffered and that a higher ratio is therefore appropriate. He contends that if he had been unable to secure similar employment his compensatory award would have necessarily been substantially higher and that the ratio of punitive to compensatory damages would be

---

injury to the plaintiff in a Title VII action is not measured solely by the award of compensatory damages; it is also reflected in the size of the back pay award.").

**11.** Since Plaintiff was awarded substantial compensatory damages this holding is inapposite.

closer to three (3) to one (1). Plaintiff cites *TXO* and *Cush–Crawford v. Adchem Corp.*, 271 F.3d 352, 359 (2nd Cir.2001) in support of his argument; however, these cases are distinguishable.

In *TXO,* a jury awarded ten million dollars ($10,000,000.00) on a slander of title claim involving an interest in certain oil and gas development rights where the verdict for compensatory damages was nineteen thousand dollars ($19,000.00). In upholding the jury's award, the Supreme Court relied primarily on evidence of the magnitude of potential harm that the defendant's conduct would have caused to its intended victim if its wrongful plan had succeeded, and of "the amount of money potentially at stake, the bad faith of [defendant], the fact that the scheme employed in this case was part of a larger pattern of fraud, trickery and deceit, and [defendant's] wealth . . . ." *TXO Production Corp.*, 509 U.S. at 462, 113 S.Ct. 2711.

However, *TXO* was focused on unrealized potential harm "if the wrongful plan had succeeded. . . ." *Id.* at 443, 113 S.Ct. 2711. *See Gore*, 517 U.S. at 581, 116 S.Ct. 1589 ("Thus, in upholding the $10 million award in *TXO*, we relied on the difference between that figure and the harm to the victim that would have ensued had the tortious plan succeeded."). Here, Defendant's wrongful conduct did succeed; Plaintiff was terminated for unlawful reasons. *TXO* did not address mitigation as an element of damages. The fact that Plaintiff might have been less successful at mitigating his damages is not a basis of "potential harm" in a case such as this where compensatory damages can be established.[12] Indeed, there would be no reason for requiring a plaintiff to mitigate

damages if the ultimate result would effectively produce a windfall rather than compensation for injuries sustained. *See generally Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 232 n. 15, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982).

In *Cush–Crawford,* the jury awarded zero dollars ($0.00) in actual damages and one hundred thousand dollars ($100,000.00) in punitive damages on a Title VII hostile work environment claim. The Second Circuit concluded that the absence of actual or nominal damages did not preclude an award of punitive damages. *Cush–Crawford*, 271 F.3d at 359. However, unlike the plaintiff in *Cush–Crawford,* Plaintiff was awarded substantial compensatory damages.

3. Disparity Between Punitive Damages and Civil Penalties Imposed for Comparable Misconduct

The third and final guidepost of punitive damage excessiveness is "comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct," *Gore*, 517 U.S. at 574–575, 116 S.Ct. 1589., which indicates deference to "legislative judgments concerning appropriate sanctions for the conduct at issue," *id.* at 583, 116 S.Ct. 1589 (quoting *Browning–Ferris Indus. v. Kelco Disposal, Inc.*, 492 U.S. 257, 301, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989)(O'Connor, J., concurring in part and dissenting in part)). *See Iannone*, 941 F.Supp. at 414 ("This analysis allows the Court to gear the punitive damage award to how seriously society as a whole regards the defendant's conduct.").

In both *Gore* and *State Farm,* the Supreme Court concluded that the maximum

---

12. While the Court can foresee that attempts to thwart a plaintiff's mitigation efforts by providing unwarranted negative references (i.e., blacklisting), might be a basis for a successful argument based on "potential harm," there is no evidence that this occurred in this case.

fine that could be imposed for the conduct at issue was ten thousand dollars ($10,-000.00). *Gore*, 517 U.S. at 584, 116 S.Ct. 1589; *State Farm*, 538 U.S. at 415–16, 123 S.Ct. 1513. The court found that the two million dollar ($2,000,000.00) award in *Gore* was "substantially greater than the statutory fines available," 517 U.S. at 584, 116 S.Ct. 1589, and that the civil fine in *State Farm* was "dwarfed by the $145 million punitive damages award," 538 U.S. at 428, 123 S.Ct. 1513.

■ In this case, Plaintiff recovers punitive damages pursuant to his Section 1981 claim.[13] There are no comparable civil penalties for the type of conduct for which Defendant has been found liable. The closest analogous claim to Plaintiff's retaliation claim under Section 1981 is a retaliation claim under Title VII.[14] With respect to companies of a size similar to Defendant, Congress has capped the total of all damages for future pecuniary losses, nonpecuniary losses, and punitive damages in Title VII cases at three hundred thousand dollars ($300,000.00). *See* 42 U.S.C. § 1981a(b)(3). However, unlike Title VII, Section 1981 does not have a statutory cap that limits punitive damages, *see* 42 U.S.C. § 1981a(b)(4); *see also Hill*, 212 F.Supp.2d at 77 n. 11, and

> a *per se* rule that in § 1981 actions awards in excess of $300,000 violate due process would allow constitutional questions to turn on congressional judgments. Furthermore, in making the decision to limit damages in Title VII cases, Congress made the implicit judgment not to limit damages in § 1981

cases. Hence it would be inappropriate for the courts simply to extend the Title VII limitations to § 1981 cases under the guise of interpreting the Constitution.

*Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 798 (8th Cir.2004).

The absence of limits on damages in Section 1981 claims suggests that Congress envisioned that larger awards were appropriate under Section 1981 and that Title VII's statutory cap was not controlling. *See generally Tomka v. Seiler Corp.*, 66 F.3d 1295, 1316–17 (2d Cir.1995) (discussing the differences between Section 1981 and Title VII), *abrogated on other grounds by, Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Nevertheless, the Supreme Court has instructed courts to consider analogous statutory restrictions in determining the constitutionality of a punitive damages award. *Gore*, 517 U.S. at 583–85, 116 S.Ct. 1589. *See Swinton v. Potomac Corp.*, 270 F.3d 794, 820 (9th Cir.2001) (remarking "[w]e do not mean here to imply that the Title VII damages cap applies in § 1981 cases; it does not," but nevertheless looking at the Title VII damages cap in analyzing the third guidepost in relation to a Section 1981 case). *See also Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020, 1044–45 (9th Cir.2003); *Sherman v. Kasotakis*, 314 F.Supp.2d 843, 875–76 (N.D.Iowa 2004); *Florez v. Delbovo*, 939 F.Supp. 1341, 1348 (N.D.Ill.1996).

■ Thus, while it is not appropriate to institute a *de facto* judicial cap on punitive

---

**13.** Since Plaintiff can recover under Section 1981, compensatory and punitive damages are not available under Title VII. *See* 42 U.S.C. § 1981a(a)(1). NYSHRL does not allow punitive damages. *See Thoreson v. Penthouse Int'l., Ltd.*, 80 N.Y.2d 490, 499, 591 N.Y.S.2d 978, 606 N.E.2d 1369 (1992).

**14.** Since the same elements constitute a claim for employment discrimination under Section 1981 as under Title VII, Plaintiff also pleaded a retaliation claim under Title VII. *See Choudhury v. Polytechnic Inst. of N.Y.*, 735 F.2d 38, 44 (2d Cir.1984).

damages awards in Section 1981 suits by requiring consistency with Title VII capped awards, the Court should take the Title VII cap into account. Here, although the large discrepancy that existed in *Gore* and *State Farm* is not present, the Title VII cap weighs in favor of a reduction of Plaintiff's punitive damages award. However, this fact is not dispositive.

▉ The purposes of punitive damages are to punish a defendant and deter both the offender and others from similar conduct in the future. *Vasbinder v. Scott,* 976 F.2d 118, 121 (2d Cir.1992). In view of these goals and the *Gore* factors discussed above, the punitive damages award in this case was excessive. Punitive damages in the amount of five hundred fifty one thousand four hundred seventy dollars ($551,470.00) (a ratio of 4 to 1) would be sufficient to punish Defendant and deter similar wrongful conduct, would be consistent with the reprehensibility of the conduct, and would be proportionate to the actual injury suffered by Plaintiff.

Accordingly, the punitive damages award is conditionally remitted to five hundred fifty one thousand four hundred seventy dollars ($551,470.00). If Plaintiff does not accept the *remittitur*, the Court shall vacate the punitive damages award and conduct a new trial limited to the question of damages. *See Vasbinder,* 976 F.2d at 122.

V.   Conclusion

For the reasons set forth above, Defendant's motion for a new trial is DENIED and Defendant's motion for *remittitur* of the punitive damages award is GRANTED.   Plaintiff has until October 5, 2007 to accept the *remittitur*, or the Court shall vacate the punitive damages award and

order a new trial limited to the question of damages.

IT IS SO ORDERED.